**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION AT CLEVELAND**

| | | |
|---|---|---|
| Kevin Keith, | : | Case No. 1:99 cv 657 |
| Petitioner, | : | |
| -vs- | : | Judge Peter Economus |
| Christopher LaRose, Warden, Trumbull Correctional Institution, | : | |
| | : | |
| Respondent. | : | |
| | : | |

_____

**Petition for Writ of Habeas Corpus under § 2254**
_____

Petitioner, Kevin Keith, moves this Court, pursuant to Article I, § 9 and Article III of the United States Constitution, as well as the Sixth and Fourteenth Amendments, 28 U.S.C. § 2241 *et seq.* (including 28 U.S.C. § 2254), 18 U.S.C. § 3006A, and all other applicable law, and respectfully moves this Court for a Writ of Habeas Corpus declaring unconstitutional and invalid his convictions for Aggravated Murder, imposed by the Court of Common Pleas, Crawford County, Ohio, on May, 26, 1994, and ordering a new trial.

Respectfully Submitted,

The Office of the Ohio Public Defender

/s/ Rachel Troutman
Rachel Troutman – 0076741
Assistant State Public Defender
Rachel.Troutman@OPD.ohio.gov
**Lead Counsel**

/s/ Tyson L. Fleming
Tyson L. Fleming – 0073135
Assistant State Public Defender
Tyson.Fleming@OPD.ohio.gov

Office of the Ohio Public Defender
250 E. Broad Street - Suite 1400
Columbus, Ohio 43215
(614) 466-5394
(614) 644-0708 – Fax

Counsel for Petitioner

## Memorandum in Support

### I.      Introduction

Kevin Keith is entitled to the writ of habeas corpus because of the ineffective assistance of counsel he received at trial.  Keith's state post-conviction counsel failed to develop substantial issues of ineffective assistance of trial counsel.  Unlike the habeas petitioner in *Trevino v. Thaler*, __ U.S. __, 133 S.Ct. 1911 (2013), Keith was not appointed new counsel in federal court who could review and investigate potential claims.  In 2007, six years after this Court disposed of Keith's federal habeas petition, Keith succeeded in obtaining new counsel who conducted the review Keith should have received during his state post-conviction proceedings.

Upon investigating, Keith's new counsel discovered several issues that had never been raised by Keith's previous counsel.  Some of the previously undiscovered issues had fallen under the purview of *Brady v.Maryland*, 373 U.S. 83 (1963), and counsel litigated those issues in all available state courts and federal courts.  *See e.g. Keith v. Bobby*, 551 F.3d  555 (6th Cir. 2009); *State v. Keith*, 948 N.E.2d 976 (Ohio 2011).  But Keith had no forum in which to present the issues of ineffective assistance of counsel, due to the procedural limitations in both state court and federal habeas.  At that time, the only available avenue for any type of review of these claims was Ohio's executive clemency procedure, and Keith included his additional issues in his clemency request to Governor of Ohio.

On September 2, 2010, Governor Ted Strickland commuted Kevin Keith's death sentence to a life sentence. Strickland cited doubts about Keith's guilt as his reasoning for the commutation. Keith is, in fact, an innocent man, but his case was never properly presented for the courts to review. Due to procedural limitations and ineffective counsel, this Court never had the opportunity to review some of Keith's most compelling claims. Recent decisions from the Supreme Court of the United States— *Martinez v. Ryan,* __ U.S. __, 132 S.Ct. 1309 (2012), *Trevino v. Thaler*, __ U.S. __, 133 S.Ct. 1911 (2013)— have removed those procedural barriers. Keith can now present this Court with the ineffective assistance of counsel issues that should have been a part of Keith's original federal habeas petition.

The claims that counsel failed to raise are as follows: First, Keith was denied the effective assistance of trial counsel when his attorney failed to obtain an expert to challenge the State's claim that the imprints left by the getaway car fit Keith's girlfriend's car. Second, Keith was denied the effective assistance of trial counsel when his attorney failed to use evidence in the surviving victim's medical records to rebut that victim's "independent" identification of Keith. Third, Keith was denied the effective assistance of trial counsel when his attorney failed to interview and present the testimony of alibi witness Yolanda Price. Fourth, Keith was denied the effective assistance of trial counsel when his attorney failed to investigate and present evidence that Rudel Chatman was an informant against Rodney Melton regarding Melton's drug trafficking of heroin.

## II. Statement of facts

On the evening of February 13, 1994, at approximately 8:45 p.m., a gunman entered a Bucyrus Estates' apartment and shot all six people inside. Three were killed: Marichell Chatman; her five-year-old daughter, Marchae; and Marichell's aunt, Linda Chatman. The other

three victims survived: Marichell's boyfriend Richard. Warren, and Marichell's young cousins, Quanita and Quinton Reeves. On February 15, 1994, Kevin Keith was arrested for these shootings.

The surviving adult, Richard Warren, told no less than four different witnesses—including a police officer—that he did not know who shot him. *See* Tr. 240, 305, 620, 623. Two days after Keith's arrest, seven-year-old surviving victim Quanita Reeves told her nurse that she was shot by "Bruce," who was "Daddy's friend." Tr. p. 735. Quanita reiterated to detectives that "Daddy's friend Bruce" was the man who shot her. Tr. 715. She then excluded the picture of Keith as the person she knew as Bruce.

But the police had immediately committed themselves to the fact that Keith was the shooter. One of the officers testified that he brought up Keith's name at the crime scene. Tr. 790. At first, the connection was logical. The victims had a family member, Rudel Chatman, who was the informant for a cocaine drug raid that had occurred a couple weeks before, and Keith had been one of the eight people arrested in that raid.[1] Also, five witnesses told the police that they had seen a "large black man"—described as about 6'1", 350 lbs.—in the area. Keith was 6', 300 lbs and one of the few black men in the small city of Bucyrus.

Then, weeks after Keith's arrest, the police discovered that the "large black man" described by those five witnesses was *not* Kevin Keith.[2] And none of the witnesses had actually

---

[1] Keith was charged with selling what equaled to less than 3 grams of crack cocaine.

[2] Larry A. Downing and Donald W. Banks described to police the "large black male" they saw go into apartment 1738H. *Keith v. Bobby*, 1:08-cv-01687, Doc. 1-9, PageID #: 141. But Karie Walker was the large black male living in apartment 1738H. Tr. p. 610. Tyrone Nickelson and Michael Albright described a large black male, and the police officer found that the physical description matched that given by eyewitness Nancy Smathers. *Id.* at PageID#: 124. Later the two men reported to police that it was not Keith they saw; it was Walker. *Id.* at PageID#: 174. Police also thought Tracy Albright saw Keith at the scene of the shooting that night. Albright

4

seen that man do anything criminal; they had all been describing a man who was simply a bystander at the scene. That bystander had just moved in to the apartment complex a few days earlier.

## A. Keith has an alibi.

Keith had an alibi supported by several people. Keith's alibi was presented at trial through the testimony of his aunt Gracie Keith (Tr. 683-89), and by his girlfriend's neighbor Judith Rogers (Tr. 689-702). On the date of the murders, Keith arrived at the home of his girlfriend, Melanie Davison, sometime after 6 p.m. *See* Exh. 1 (Melanie Davison 3/5/94 Police Statement). They ate dinner, and Melanie then fed her kids dinner while Keith took a nap in the bedroom. *Id.* Melanie napped also and got out of bed at 8:25 p.m., took Keith's car to visit her mom, and she picked up some beer before returning home. *Id.*

Keith woke up from his nap and, as Melanie told the police, they left her home in Mansfield at about 8:45 p.m. *Id.* Judith Rogers, Melanie's downstairs neighbor, saw Keith and Melanie leaving Melanie's home. Tr. p. 691. Rogers was watching a television show that started at 8:30, and she testified that she saw Keith and Melanie get into a blue car and leave at about 8:45 p.m. *Id.* at 692. It was at this time that the shootings were occurring, miles away in Bucyrus, at the Bucyrus Estates Apartments.

Around 9:00 p.m., they arrived in Crestline at the home of Keith's aunt, Gracie Keith. Exh. 1; Tr. p. 685. Melanie stayed in the car while Keith went inside to talk to his uncle, Roy Price, from whom Keith borrowed five dollars. Exh. 2 (affidavit of Yolanda Price). Among the many people who were there that night was Yolanda Price. She recalls Keith arriving at Gracie Keith's home between 8 p.m. and 9 p.m, and she recalls seeing Melanie waiting outside in the

---

corrected them, however, and informed them that the black man she saw was Walker. *Id.* at PageID#: 197.

blue car that they'd arrived in—a car that belonged to Keith's other girlfriend, Zina Scott. *Id.*
Yolanda Price left shortly after Keith left, and she arrived home around 9:30 p.m., when she first heard about the murders in Bucyrus. *Id.*

According to Melanie, she and Keith were at Gracie Keith's house in Crestline for about ten minutes and arrived back at Melanie's Mansfield house at 9:25 p.m. *Id.* The sheer distance involved makes it impossible for Keith to have been the shooter. From Gracie Keith's house, in Crestline, it is 19 miles to the apartment, and it would have taken approximately 25 minutes to make that drive. Exh. 3 (Google map of drive from Crestline to Bucyrus.) And Mansfield and Bucyrus are approximately 30 miles apart. Keith was accounted for before, during, and after the shootings that took place at 8:45 p.m.

**B.      Lack of physical evidence**

No physical evidence definitively linked Keith to the shootings, although the State attempted to use a car with a "043" in the license plate number and a shell casing to connect Keith to the crime. The night of the shooting, Nancy Smathers told police she saw the person who was probably the shooter get into a car. She described the color of the car as "a white, cream, light yellow." Tr. p. 389. She reported that the shooter got his car stuck in a snow bank and had to push the car out to escape. *See id.* at 381-85. Based on her report, the police took impressions from the snow of the tire treads and a partial license plate impression in the snow.

BCI's Michelle Yezzo determined that the impression showed "the numbers "043" in the region of the license plate area." Yezzo Trial Deposition, p. 13. Keith's girlfriend Melanie often drove the car that belonged to her grandfather, Alton Davison, and Davison's license plate contained a "043." Yezzo concluded that the numbers were "similarly placed on the vehicle as the license plate is placed on [Alton Davison's car]." *Id.* Even though there was not a scrap of

evidence inside the car that linked it to Keith or to the crime scene (*see* Yezzo Deposition, pp. 18-19, 27), the police determined that it was the getaway car and that Keith had been the driver.

Smathers, the one eyewitness to the getaway car, was never shown a photograph of Davison's car to see if it was the car she saw that night. *See* tr. pp. 379-402. Also, the State never explained why Smathers testified that the shooter's car was "a white, cream, light yellow" (Tr. p. 389), but the police settled on Davison's car that was described by BCI as "gray"(Tr. p. 509), or by Davison as "green." Tr. p. 448, 449. *See also* Exh. 4 (Color photo of Alton Davison's car). And, unfortunately, Keith's defense counsel never got an expert to properly challenge the State's position that Davison's car had been the getaway car.

The State also argued that a spent bullet casing, found outside the home of Fernelle Graham, pointed to Keith as the shooter. Graham lived in the house across from the General Electric plant, and because this is where Keith picked up his girlfriend Zina Scott on the night of the murders, the State used it to link Keith to the crime. But the record refutes the purported link to Keith.

Ms. Graham testified that it was "a quarter to ten" when she looked out of her window and saw the trash on her sidewalk. Tr.p. 430. According to her testimony, the bullet casing was found with that trash. But Zina Scott testified that Keith picked her up at the GE plant 11 p.m. that night. If the trash and casing were outside Graham's house at 9:45, and Keith picked up Zina at 11 p.m., then the trash and bullet casing were there *before* Keith was in the area.

Furthermore, the initial report received by police was that Graham found the casing at McDonalds. According to the Bucyrus Police radio dispatch logs (at 0842 on 2-14-94), when the woman reported the found casing, she reported that she "thinks she may have found it in the McDonalds area." Exh. 5, p. 3. Significantly, the State never disclosed these logs and this

information that is inconsistent with Graham's testimony. The radio logs were exhibits in a case that is wholly unrelated to Keith's, and they were discovered by chance by Keith's current counsel.

C. **There is an abundance of evidence against the other "credible suspect[]." (Governor's Statement Regarding Clemency Application of Kevin Keith, 9/2/10.)**

Thirteen years after Keith was convicted and sentenced to death, he discovered that a convicted murderer, Rodney Melton, had told an informant of his own plans to carry out the shootings in this case. In 2007, Keith uncovered documents from an investigation spearheaded by the Ohio Pharmacy Board. In these documents, Keith learned that Rodney Melton not only had motive to injure the victims of the Bucyrus Estates shootings, but Melton also told a confidential informant two weeks before the Bucyrus Estates shootings that he had been paid to "cripple" Rudel Chatman, whose actions as a police informant were the motive behind the shootings. *See* Tr. 830. The Melton brothers also had "spread the word that anybody that snitches on them would be killed." Exh. 6 (pharmacy board report). *See also* Exh. 2 ("About two weeks before the murders, I heard Rodney say, "if Rudel ever snitched on me, I'd kill him.")

Chatman actually *was* a police informant against Melton with regard to Melton's heroin sales, and Melton found out about it sometime before the Bucyrus Estates shootings. *See* Exh 7 (Milton James Parker affidavit) ("I remember that Rodney Melton told me that Rudel Chatman was a snitch. Although I do not remember the exact date that Rodney told me that, I do remember it was before the day that Rudel's family got shot at the Bucyrus Estates.") During Keith's clemency proceedings, the State confirmed what Keith's counsel suspected: "On April 11, 1994, two months *after* the murders, Melton was indicted for a drug trafficking offense, in which Rudel Chatman was a confidential informant." Exh. 8 (State's supplement to the parole

board)(emphasis in original).  The State claimed that Melton , however, would not have had any reason to know that Chatman was an informant against him until Melton's arrest on March 25, 1994. *Id.*

 The State was wrong, however, as evidenced by the statements of Rodney Melton's accomplice, Milton James Parker.  The March 4, 1994, police interview with Parker confirms that the Meltons had  figured out that Rudel Chatman was an informant.  When the police asked Parker if he knew anything about the Bucyrus killings (for which Keith had already been arrested), Parker responded by telling them that "we know about Rudell [sic], you know? You might as well just keep him under wraps or whatever you're gonna do with him, Jerry[3], you know? 'Cause he's done around here."  Exh. 9, p. 16 (Parker interview with police).  This interview occurred three weeks *before* Melton was arrested, and less than three weeks after the Bucyrus Estates killings.

 Moreover, Melton was seen around the area shortly after the shootings (Tr. 670); he had the same color of car the shooter drove  (Tr. 675), and he insisted on using that car in his criminal activities.  Exh.  6, p. 11.  The license plate of his car matched the partial number the police lifted from the snow.  Tr. 679.   He knew the type of ammunition used.  Tr. 670.  He told police his car (which fits the physical description of the car seen at the crime scene) was broken down.  Tr. 671.  He gave the police two conflicting alibis for the time of the crime.  Tr. 673, Exh. 10 (Police Index Report p. 30).   He had motive to seek revenge on Rudel Chatman because Chatman was an informant regarding Melton's heroin sales.   Exh. 7.   He was overheard at the hospital after the shootings stating that this happened because of Rudel's "snitching".   Tr. 758. He had previously told a confidential informant that he would kill anyone who "snitched" on him.  Exh. 6, p. 8.  He told a confidential informant, two weeks before the shootings, that he had

---

[3] "Jerry" is Detective Jerry Hickman.

been paid $15,000 to "cripple" the person responsible (Rudel Chatman) for recent drug raids. Exh. 6, p. 11. Melton's brother told another confidential informant that Melton was paid to kill Rudel. Exh. 9, p. 16. Melton was known to wear the particular type of mouth-covering mask that the killer wore. Exh. 11, crea (Confidential Informant Voluntary Statement January 14, 1994).

And Quanita Reeves, the 7-year-old survivor told police that the shooter was her "daddy's friend, Bruce." Quanita likely got the right family, but the wrong brother. Rodney and Bruce were inseparable and both were often with Quanita's father, due to their involvement in a pharmacy burglary ring. Quanita may have just gotten their names mixed up.

Significantly, Melton's own family members believed he was responsible for the crimes in this case. Tr. pp. 695-702. They contacted Keith's trial attorney during the trial and told him that Melton is a "psychopathic killer." Tr. p. 700. Keith's trial counsel presented this information to the attention of the judge and the prosecutor, but the jury never heard it.

Defense counsel then called Melton to the stand to question him about his suspicious behavior and his violent past. Melton had previously been convicted of murder and other violent crimes, and he is suspected to be the killer in other unsolved murders. Melton, of course, did not admit to being the killer.

At one point during the trial and out of the presence of the jury, defense counsel and the prosecution discussed Melton's responsibility for other murders for which he had not been charged. They argued over whether the State would charge Melton:

Defense counsel: Mr. Wiseman, are you charging [Melton] for the other two murders from years ago that I told you about yesterday?

Prosecutor: I don't know. If there is evidence, sure, then I am going to charge him with them.

Defense counsel: I know this woman is telling the truth and he has murdered and killed those two men and I believe what she told me yesterday.

The Court: But she didn't witness them.

Prosecutor: And we can't prove it because he bragged to the family years ago. You can't convict him of this.

Defense counsel: Even based on the fact the same gun was used to kill the guy in 1971. So the murders go on.

The Court: I understand that, but we are dealing with this case now.

Tr. pp. 760-61. Defense counsel questioned Melton about the murder for which he was convicted ("I shot someone I don't think they call it committing murder"), the gun he used (Melton claimed it was "not really" his gun because "I bought it from somebody else"), and about another murder in Crestline, Ohio, in which the same gun had been used ("I don't know anything about it."). *Id.* at 761-62.

### D. Richard Warren—the key to the State's case against Keith

To overcome the strength of Keith's alibi, the absence of physical evidence establishing Keith as the shooter, Quanita's exclusion of Keith as her shooter, and a strong alternative suspect, the State ultimately relied heavily on surviving adult Warren. Despite having initially told four witnesses that he did not know who shot him, Warren ultimately recalled that his shooter's name was 'Kevin.' However, Warren admitted on cross-examination that he did not know whether he or the police first mentioned the name "Kevin" as the person who was the shooter. *See* Tr. 372 (Defense Counsel: "So you don't recall whether you mentioned the name to them or they mentioned it to you; do you?" Warren: "No, sir, I do not.").

After the name "Kevin" was settled upon, the police provided Warren with a 'name lineup' of four 'Kevins.' Defense counsel argued that the police improperly influenced Warren into identifying Keith in order to bolster the case they believed they had solved. At trial, the

prosecution countered the allegation of police contamination by claiming that Warren had first provided a nurse with the name 'Kevin.'

According to the State's closing argument, the case against Keith all came together when nurse "John Foor called the Bucyrus Police Department. That is how the name Kevin found its way into this case." Tr. 835. Nurse John Foor testified that Warren wrote down the name "Kevin" before he could even talk. Tr. 778. (Warren, however, testified that he did *not* write down a name. Tr. 368). Foor said this occurred "[s]ometime around 5:00 a.m." on February 14, 1994. *Id.* The State claimed that the victim was only then provided with a 'name line-up' of 'Kevins' to choose from. Tr. 656.

Lieutenant John Beal is the police officer who reportedly took the call from Foor. Although the State called Beal as a witness, he *never testified* that he received that crucial call from Foor. Tr. 402-10. His trial testimony (which consisted of less than six pages) was simply about what he saw when he arrived at the crime scene. *Id.*

Beginning with a request for discovery, filed just two weeks after the crime and Keith's arrest, Keith had repeatedly attempted over the years to obtain confirmation of Foor's call to police. The Bucyrus Police Department had testified that its system automatically recorded all incoming calls. Tr. 218. Keith was told that "[t]he recorded phone call from Nurse Foor was not copied for the prosecution or the defense at that time," and the recording has been destroyed. Exh. 12 (Beal letter). Keith was also told that there was no daily phone log that documented incoming phone calls.

In 2010, counsel for Keith learned through the sworn testimony by Bucyrus Police officers in an unrelated case that the Bucyrus Police Department kept radio dispatch logs, and "the [radio] log records the information that comes in through calls." Exh. 13, p. 77 (Davila

transcript).   In other words, the radio logs also served as daily phone logs.  Because the logs had not yet been destroyed, Keith obtained the logs from the dates relevant to his case.

The radio logs are "contemporaneous with the call" and could be used as an "index to the tapes" of the calls.  Exh. 13, p. 77.  But the logs showed no call from Nurse John Foor—not at 5 a.m. or any other time.  Exh. 5.

Despite all of the evidence available that Keith is innocent, Kevin Keith was convicted and sentenced to death.  From crime to sentencing, only three-and-a-half months passed.

###    E.    Several issues missed throughout appeals

The trial court appointed counsel for Keith's appeals, and that appellate counsel was also Keith's state-postconviction counsel and ultimately his federal habeas counsel.   Appointed counsel were members of the private bar, and they relied upon the trial court to provide them with their fees to litigate Keith's post-conviction petition.  The trial court specified in its entry that counsel would be paid $50 per hour, with a maximum payment of $10,000 for each attorney. Exh. 14, p. 3.

In Ohio, post-conviction is the appeal when the petitioner must support his claims with evidence outside the record, and Keith's post-conviction petition was focused on the mitigation portion of the trial.  *See State v. Keith*, 1998 Ohio App. LEXIS 3836 (Ohio Ct. App., Crawford County Aug. 19, 1998) ("On September 20, 1996, Appellant filed a Petition to Vacate or Set Aside Judgment and Sentence in the trial court pursuant to R.C. 2953.21 wherein he argued, inter alia, that his conviction and sentence was void or voidable because he was denied the right to effective assistance of counsel due to the trial attorney's failure to investigate and present important mitigation evidence during the penalty phase of the trial.")  The majority of issues

attacking the conviction were raised on direct appeal. No outside the record evidence could be used to support those claims.

Keith's counsel continued on to represent him in his federal habeas proceedings. At the time Keith's habeas petition was considered and rejected by this Court, the precedent was clear that procedural default would bar consideration of any claims that had not been properly presented in state court. The ineffective assistance of post-conviction counsel, at that time, could not excuse the failure to raise the claim. *See Coleman v. Thompson*, 501 U.S. 722, 752-753 (1991). Thus, even if Keith's counsel realized that they had failed to identify and raise several meritorious issues of ineffective assistance of trial counsel, they could not have presented them to this Court at that time.

In 2007, Keith requested that his counsel withdraw from representing him, and he was provided with new attorneys for the first time since 1994. Despite the fact that Keith had exhausted all of his allotted appeals, new counsel thoroughly investigated the case against Keith. By July 2007, after being on the case for only two months, new counsel discovered incriminating information about Rodney Melton in the Ohio Pharmacy Board files and filed Keith's first new trial motion. Keith also requested and was denied authorization to file a successive habeas petition. *See Keith v. Bobby*, 551 F.3d 555 (6th Cir. 2009).

When counsel for Keith discovered additional suppressed evidence in 2010, they simultaneously litigated a second new trial motion and sought clemency. In the meantime, on September 2, 2010, Ohio Governor Ted Strickland commuted Keith's death sentence to life, because of doubts about Keith's guilt. In doing so, Governor Strickland issued a statement lamenting that "the pending legal proceedings may never result in a full reexamination of his case, including an investigation of alternate suspects, by law enforcement authorities and/or the

courts. That would be unfortunate – this case is clearly one in which a full, fair analysis of all of the unanswered questions should be considered by a court." (Governor's Statement Regarding Clemency Application of Kevin Keith, 9/2/10.)

## III.    Grounds for Relief

## First Ground for Relief

**Kevin Keith was denied the effective assistance of counsel, in violation of his rights under the Sixth and Fourteenth Amendments, during the trial phase of his capital trial, when counsel failed to obtain and present expert testimony refuting the State's evidence that a car to which Keith had access was linked to the crime scene.**

1.  Kevin Keith's trial counsel failed to represent him according to the prevailing norms at the time of his capital trial.

2.  Keith's trial was in 1994. At that time, the guides to determining what was reasonable legal representation in a capital case were the 1989 version of the American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases.

3.  Guideline 11.4.1 governs the investigation aspect of defense counsel's representation in death penalty cases. Subsection D.7 of that Guideline advises that counsel should secure the assistance of experts where it is necessary or appropriate for the "preparation of the defense," "adequate understanding of the prosecution's case," or for "rebuttal of any portion of the prosecution's case at the guilt/innocence phase."

4.  Ineffective assistance of counsel is measured under the standards established in *Strickland v. Washington*, 466 U.S. 668 (1984). First, the defendant must show that counsel's performance was deficient. "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.* at 688. To demonstrate prejudice, a defendant must "show that there is a reasonable probability that,

15

but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

5.  Expert assistance was essential in Keith's case in order to rebut the forensic evidence that the prosecution used against him. Eyewitness Nancy Smathers testified that she saw the perpetrator get his car stuck in a snow bank, and the tire and license plate imprints in the snow were the key forensic evidence that allegedly linked Keith to this crime.

6.  Michele Yezzo, a forensic scientist from the Bureau Of Criminal Identification and Investigation, testified in a deposition on May 12, 1994, concerning the imprint evidence from the crime scene.

7.  Yezzo testified that she was "able to identify the numbers "043" in the region of the license plate area." Dep. Tr. 13. The numbers were "similarly placed on the vehicle as the license plate is placed on [Alton Davison's car]." *Id.*

8.  Yezzo also testified that the tread designs from the tires that were previously on Alton Davison's car were similar in tread design to the tire imprints left at the crime scene. Dep. Tr. 23. Yezzo did not actually physically examine a tire to make this comparison; she relied on a picture from a brochure to make her determination. Dep. Tr. 22.

9.  Alton Davison's granddaughter was Keith's girlfriend, and she drove her grandfather's car on occasion. The prosecution maintained that Keith's association to Davison's granddaughter meant Keith had access to Davison's car. Davison's granddaughter never testified.

10. Keith denied ever being in Davison's car, and Yezzo conducted forensic testing on the inside of that car. *See* Yezzo trial deposition, pp. 18-19, 27. As the prosecutor put it,

they attempted to "gather every shred of possible evidence in this case." Tr. 853. Still, there was not a scrap of evidence inside the car that linked it to Keith or to the scene. Yezzo Deposition, pp. 18-19, 27.

11. The prosecution's evidence linking Davison's car to the crime scene, as well as linking Davison's car to Keith, strengthened its case considerably. The police had found no fingerprint, blood, or DNA evidence that linked Keith to the car or crime scene.

12. Reviewing courts have also relied upon the evidence regarding the car and its license plate, the car's link to Keith, and the license plate imprint in the snow at the crime scene. *See State v. Keith*, 684 N.E.2d 47 (Ohio 1997); *Keith v. Bobby*, 551 F.3d 555, 558 (6th Cir. 2009); *Keith v. Mitchell*, 455 F.3d 662, 667 (6th Cir. 2006); *State v. Keith*, 1996 Ohio App. LEXIS 1720, *7 (Ohio Ct. App., Crawford County Apr. 5, 1996); *State v. Keith*, 891 N.E.2d 1191, 1196 (Ohio Ct. App., Crawford County 2008)

13. Defense counsel failed to hire an expert who could have reviewed Yezzo's work and findings concerning the license plate and tire imprints. Armed with no knowledge of the correct methods used in the examination of tire imprints, defense counsel's questions only allowed Yezzo to confirm her findings in front of the trial court. Defense counsel asked no questions of the process or procedure used by Yezzo to determine the numbers and placement of the license plate.

14. Experts in tire impressions, such as William J. Bodziak, were available at the time of Keith's trial and would have demonstrated the flaws in Yezzo's findings. As noted in his Curriculum Vitae, William Bodziak is a retired FBI Special Agent who specializes in forensic examinations of footwear and tire tread impressions. Exh. 15 (Curriculum

Vitae). He has testified as an expert witness concerning footwear and tire tread impressions in courts throughout the country.

15. Bodziak reviewed the same evidence that Yezzo reviewed when making her findings concerning the license plate, bumper, and tire imprints. Exh. 16, pp. 1-2 (Bodziak report).

16. Yezzo determined that the numbers in the partial license plate left in the snow at the crime scene were "043", and were set toward the driver's side of the car with spacing and orientation similar to the license plate "MVR043" on Alton Davison's car. Dep. Tr. 13. Bodziak stated he could find no evidence of any numeral "3" from the license plate imprint. Exh. 16, p. 3.

17. Bodziak's findings also contradict the reasoning behind the exclusion of Rodney Melton's car as the getaway car. Melton also had a license plate with "043" in it, but the Bucyrus police concluded that in the snow impression, the numbers came before the letters. Bodziak pointed out in his report that there are no other reference points visible on the license plate to determine from what portion of the license tag the numerals "4" and "0" would be, since no other numerals or reference areas appear in the photographs. *Id.* "[B]ased on the limited detail, a distinction could not be made between a license plate that reads 'MVR043' versus others that have '04' somewhere on the plate." Exh. 16, p. 4. Therefore, Rodney Melton's license plate (043LIJ) on his cream or light yellow Chevy Impala (which fit the eyewitness description) could very well have left the impression in the snow. *See* tr. p. 389 (Smathers testified that the shooter's car was "a white, cream, light yellow"). *See also* Exh. 11, 1/14/94 statement of confidential

informant, p. 7 ("Rodney Meltons [sic] car a 78 Impala, just repainted it is a cream to yellow.")

18. Bodziak noted that Yezzo and BCI did not follow the correct procedures, because "the actual license plate was never removed to physically compare it to a scaled photograph taken of the impression in the snow." Exh. 16, pp. 4-5. "Standard laboratory procedure is to use the original evidence when making a comparison." *Id.* Also, "none of the photographs taken of the license plate impression were taken with a scale properly positioned." *Id.* "Therefore, even if the license plate was removed for comparison, none of the photographs could later be enlarged to a natural size for a direct physical comparison to the license plate." *Id.*

19. Bodziak determined that Alton Davison's car bumper was **not consistent** with the car bumper impressions left in the snow bank at the crime scene. "The photographs referred to by the State as the bumper impressions in the snow bank are not consistent with the profile of the front of Alton Davison's car." Exh. 16, p. 2. "The license plate on Davison's car was mounted fairly flush with the bumper." *Id.* "Contact with the license plate to the degree that it pushed the snow enough to produce an impression, would also have produced impressions of the remainder of the bumper." *Id.* "No evidence of the other areas of the bumper appear in the photographs; instead, the snow is undisturbed in those areas." *Id.*

20. Bodziak outlined the deficiencies of agent Yezzo's analysis of the tire impression left at the scene and the tires on the Oldsmobile Omega. Yezzo opined that the tires that were previously on the Oldsmobile Omega were similar in tread design to the tire imprint left in the snow based on a picture of the tire in a brochure. Dep. Tr. 22.

21. Bodziak disagreed with Yezzo's unsupported conclusions. "Tires are approximately 6-7 feet in circumference and their tread element sizes change continually around that circumference." Exh. 16, p. 5. "In order to be able to make any relevant examination with regard to tread dimensions, a successful detailed cast of that impression was needed and would need to be compared to full circumference tire impressions from a Firestone tire of that size." *Id*. Without performing this type of test there was no way to determine whether this was actually a "P185 80 R13" tire (tires previously on Davison's car) or another size. *Id.* However, "the nature of the impression and improper position of the scale would not permit any dimensional analysis to be made with the photographs taken by the State agent." *Id.* Bodziak also pointed out that "the forensic use of the word similar has no further meaning than it would for a layman in that it can only attest to a visual likeness of sorts." Exh. 16, p. 6. Also, "the term 'similar in tread design' does not include the tread dimension and that particular tire was made in many different sizes." *Id.*

22. Bodziak also mentioned that "there are no photographs, measurements or other documentation that would confirm or otherwise offer proof the tire imprint and the license plate imprint were related to one vehicle, as opposed to two separate vehicles." Exh. 16, p. 2. "Due to the lack of bumper marks in the snow bank, it is not possible to conclude whether the license tag and tire impressions represent one simultaneous event or two unrelated and independent events." *Id.* at 6.

23. By not hiring a tire impression expert, defense counsel could not challenge the process and procedure used by Yezzo to determine that the tire imprint left in the snow was similar in tread design to the tires previously on Davison's car. "Confrontation is one

means of assuring accurate forensic analysis." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 318 (2009). Defense counsel did not know that using a brochure with a picture of tire, instead of an actual tire, was the proper procedure in trying to determine whether it was similar in tread design to another tire. "Confrontation is designed to weed out not only the fraudulent analyst, but the incompetent one as well." *Id*. at 319. Defense counsel did not even know whether the term "similar in tread design" had any significance.

24. By not hiring an expert, defense counsel could not challenge the prosecution's arguments that the bumper of Davison's car—a car linked to Keith by his girlfriend—fit the impression left in the snow at the crime scene.

25. By not hiring an expert, defense counsel could not challenge Detective Corwin's testimony that Melton's license plate could be ruled out because his plate "said 043LAJ [sic] and the impression in the snow, the letters were before the numbers." Tr. 746.

26. Ineffective assistance of counsel is measured under the standards established in *Strickland v. Washington*, 466 U.S. 668 (1984). First, the defendant must show that counsel's performance was deficient. "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.* at 688. To demonstrate prejudice, a defendant must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

27. Keith's trial counsel never consulted with an expert or investigated whether Yezzo's findings were based on the proper procedures or methods. Flawed forensic testimony can

have a significant impact on the outcome of a trial.[4]  "Serious deficiencies have been found in the forensic evidence used in criminal trials."  *Melendez-Diaz*, 557 U.S. at 319.

28. "Forensic evidence is not uniquely immune from the risk of manipulation. According to a recent study conducted under the auspices of the National Academy of Sciences, '[t]he majority of [laboratories producing forensic evidence] are administered by law enforcement agencies, such as police departments, where the laboratory administrator reports to the head of the agency.'   National Research Council of the National Academies, Strengthening Forensic Science in the United States: A Path Forward 183 (2009) (hereinafter National Academy Report). And '[b]ecause forensic scientists often are driven in their work by a need to answer a particular question related to the issues of a particular case, they sometimes face pressure to sacrifice appropriate methodology for the sake of expediency.  Id., at 23–24. A forensic analyst responding to a request from a law enforcement official may feel pressure--or have an incentive--to alter the evidence in a manner favorable to the prosecution."  *Melendez-Diaz*, 557 U.S. at 318.

29.  Testimony from an expert such as Bodziak would  have severely undermined the State's case against Keith.  The State used Yezzo's testimony to link Keith to this crime.  Expert testimony would have excluded Alton Davison's car as the car leaving the scene of the crime and included Melton's Chevy Impala as a possible vehicle that left the license plate imprint.

30. Keith was prejudiced by his counsel's failure to use a forensic expert like Bodziak.

## Second Ground for Relief

---

[4] *See e.g.* http://www.washingtonpost.com/local/crime/us-reviewing-27-death-penalty-convictions-for-fbi-forensic-testimony-errors/2013/07/17/6c75a0a4-bd9b-11e2-89c9-3be8095fe767_story.html

**Kevin Keith was denied the effective assistance of counsel during the trial phase of his capital trial, when counsel failed to use Richard Warren's statements to hospital personnel to undermine Warren's purported independent identification of Keith as his shooter.**

31. Kevin Keith's trial counsel failed to represent him according to the prevailing norms at the time of his capital trial.

32. Keith's trial was in 1994. At that time, the guides to determining what was reasonable legal representation in a capital case were the 1989 version of the American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases.

33. Guideline 11.4.1 governs the investigation aspect of defense counsel's representation in death penalty cases. Subsection D.7 of that Guideline advises that counsel should secure the assistance of experts where it is necessary or appropriate for the "preparation of the defense," "adequate understanding of the prosecution's case," or for "rebuttal of any portion of the prosecution's case at the guilt/innocence phase."

34. Ineffective assistance of counsel is measured under the standards established in *Strickland v. Washington*, 466 U.S. 668 (1984). First, the defendant must show that counsel's performance was deficient. "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.* at 688. To demonstrate prejudice, a defendant must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

35. Richard Warren was the sole surviving victim to identify Keith as the shooter. Keith's defense has always been that Warren's identification is mistaken and that Warren was

unduly influenced by the police into identifying Keith by name and photo. As defense counsel told the trial judge, "Well, you see part of our defense is that the state has put these names and pictures into [Warren's] mind." Tr. p. 358.

36. After being shot and while waiting for medical help, Richard Warren told Dody Roberts, Christine Mullins, and Bucyrus Police Officer David Koepke that he did not know who shot him because the man was wearing a mask. *Id.* at 242-243, 305, 623. Officer Koepke testified that Warren was coherent when he asked him several times who shot him. *Id.* at 305.

37. Then, Warren was taken to the Emergency Room at the Bucyrus Hospital and was interviewed by a Dr. Novack. Tr. p. 350. Warren told Dr. Novack that he didn't know who had shot him. *Id.* at 351.

38. Warren was ultimately taken to Grant Medical Center for medical treatment for his injuries, including surgery. The next day, after coming out of surgery, the State claimed that Warren independently identified Keith as the shooter.

39. According to State's witness John Foor, Warren had identified "Kevin" as his shooter "[s]ometime around 5 a.m." on February 14, 1994. Tr. p. 778. Foor claimed that, "after Mr. Warren was recovering from his operations immediately waking up from the anesthesia," Warren wrote down the name "Kevin." *Id.* at 777, 778.

40. Warren, however, testified that he did **not** write the name Kevin on a piece of paper . Tr. p. 368. In fact, Warren's hands were strapped down after surgery. *Id.* Upon being questioned further, Warren explained this discrepancy by stating that he used sign language to communicate, and his father translated it for the nurses to write down. *Id.*

41. But Foor testified that Warren had no contact with anyone other than medical personnel during the time that Foor was with him. Tr. p. 778.

42. Keith's trial attorney had access to Warren's medical records. Warren's medical records contradict that Warren independently recalled "Kevin" as the person who shot him, and independently recalled that the shooting was related to a recent drug raid. *See* Exhs. 17, 18.

43. According to Bucyrus Police Captain John Stanley, it was "shortly after noon" on February 14, 1994, when Captain Stanley first spoke with Warren's nurse and then with Warren himself. Tr. p. 774. During those phone calls, according to Captain Stanley, Warren provided the name "Kevin" and stated that he was 75% sure that "Keith" was the last name of "Kevin." Tr. p. 774-75.

44. Warren's medical records contained a document that was created by hospital security, called a "no release of information" form. The report from the Hospital Security guard was prepared in order to make sure Warren was safe from the perpetrator who was "still at large." Exh. 17. It included a physical description of the assailant: "6'3" in hiegth[sic] and about 260 lbs." *Id.* It also specifically stated that the perpetrator's "name is still unknown." *Id.* The time and date were included on the form: "February 14, 1994 at 1300 hrs.," or 1 p.m. *Id.*

45. The hospital security guard report—stating that the perpetrator's "name is still unknown"—was created hours **after** the police claimed that Warren independently identified "Kevin" or "Kevin Keith."

46. Warren ultimately admitted, when he testified at trial, that he did not actually recall whether it was him or the police officer who first mentioned the name "Kevin" in his first

interview with the police.  Tr. p. 372 (Defense Counsel: "So you don't recall whether you mentioned the name to them or they mentioned it to you; do you?"  Warren:  "No, sir, I do not.").

47. Keith's defense at trial—and every day since trial—was that he is innocent and that Warren was unduly influenced by the police into wrongfully identifying him as the person who shot him.  Keith presented evidence to the jury regarding the police influence on Warren.  The police had provided Warren with a name array of four "Kevins"; not surprisingly, Warren chose one of the "Kevins" from the list (Kevin Keith).  And despite Warren's statements at the scene that he couldn't see the shooter's face because it was masked, the police had presented Warren with a photo lineup.  Picture number five, Keith's photograph, was a much closer-up image than other images.

48. The State countered Keith's defense by pointing to the fact that Warren identified "Kevin" as the shooter, before any police influence.  Warren's records dispute that.

49.  Keith's attorney could have bolstered Keith's case significantly by using Warren's hospital records, created by non-interested parties, that show that Warren did not independently recall the name of the shooter.

50. Warren's hospital records also contain a report from R.N. Millie Woods, a "psych liaison" who examined Warren on February 21, 1994.  Exh. 18.  Woods' interview with Warren occurred one week after Warren gave his recorded account of the shooting to the police. Woods' notes regarding her session with Warren demonstrate that Warren was influenced by the police.

51. Woods wrote, "The [patient] reports **law enforcement theorized** the shooting may have been drug related involving Marcel's [sic] brother." Exh. 18 (emphasis added). In other words, the police shared their theories with Warren.

52. This information would have significantly bolstered Keith's defense "that the state has put these names and pictures into [Warren's] mind." Tr. p. 358.

53. Keith's counsel were provided with Warren's hospital records, and this is evidenced by the fact that defense counsel used some of them in his defense of Keith. *See tr.* p.781, Defendant's Exhibit 22. Although trial counsel attempted to challenge Warren's account through the improper photo line-up, the police providing Warren with the name "Kevin," the police providing Warren with four last names that included "Keith," and with Warren's initial statements that he didn't know who shot him, trial counsel inexplicably failed to use the hospital records to counter the testimony of the State's witnesses.

54. There is no reasonable explanation for counsel's failure to use the security guard report and Millie Woods' notes.

55. This Court must apply "[a] standard of reasonableness … as if one stood in counsel's shoes." *Rompilla v. Beard*, 545 U.S. 374, 381 (2005). Counsel did not need to "scour the globe on the off chance that something would turn up." *Id.* at 383. All he needed to do was review the documents in his possession. Counsel was deficient in his failure to examine the hospital records with which he had been provided. *See id* ("There is no need to say more, however, for a further point is clear and dispositive: the lawyers were deficient in failing to examine the court file on Rompilla's prior conviction.").

56. Trial counsel should "seek information concerning the incident or events giving rise to the charge(s), and any improper police investigative practice or prosecutorial conduct

which affects the client's rights…"  1989 ABA Guidelines for the Appointment and Representation of Counsel In Death Penalty Cases 11.4.1 (2)(A).  Had trial counsel done so, they would have discovered information that refuted the State's claims that Warren's account of the shooting was independently produced from his own memory.

57. To overcome the strength of Keith's alibi, the absence of physical evidence establishing Keith as the shooter, Quanita's exclusion of Keith as her shooter, and a strong alternative suspect, the State ultimately relied heavily on surviving adult Warren.  Keith's defense has always been that the police unduly influenced Warren.  Woods' account of her conversation with Warren bolsters Keith's position, and it undermines the State's claim that the police in no way influenced Warren.  The hospital security guard report contradicts the State's claim that Warren independently recalled the name "Kevin" and/or "Keith" before any police influence.

58.  Warren's testimony was a compelling piece of evidence against Keith, and the courts relied upon the detail contained within Warren's account: "It will be recalled that the perpetrator put a gun to Marichell's head, complaining bitterly about Marichell's brother 'ratting on people.' Rudel Chatman, the victim's brother was a police informant in a drug investigation involving Kevin Keith."  *State v. Keith*, 2008 Ohio App. LEXIS 5176, 10-11 (Ohio Ct. App., Crawford County Dec. 1, 2008) .   It is incredibly significant that it was " **law enforcement"** who "theorized the shooting may have been drug related involving Marcel's [sic] brother."  Exh. 18.

59. This evidence would have been particularly compelling to the jury, because it came from disinterested third parties.  Keith was severely prejudiced by his counsel's failure to use

Warren's hospital documents, and there is a reasonable probability that Keith would have been acquitted had his counsel used them in his defense.

**Third Ground for Relief**

**Kevin Keith was denied the effective assistance of counsel during the trial phase of his capital trial, when counsel failed to present the testimony of alibi witness Yolanda Price.**

60. Kevin Keith's trial counsel failed to represent him according to the prevailing norms at the time of his capital trial.

61. Keith's trial was in 1994. At that time, the guides to determining what was reasonable legal representation in a capital case were the 1989 version of the American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases.

62. Guideline 11.4.1 governs the investigation aspect of defense counsel's representation in death penalty cases. Subsection D.7 of that Guideline advises that counsel should secure the assistance of experts where it is necessary or appropriate for the "preparation of the defense," "adequate understanding of the prosecution's case," or for "rebuttal of any portion of the prosecution's case at the guilt/innocence phase."

63. Ineffective assistance of counsel is measured under the standards established in *Strickland v. Washington*, 466 U.S. 668 (1984). First, the defendant must show that counsel's performance was deficient. "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.* at 688. To demonstrate prejudice, a defendant must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

64. Keith had several alibi witnesses who could verify that he was not in Bucyrus at the time the shootings occurred. Yolanda Price was one of them, but trial counsel failed to interview her and call her as a witness in Keith's defense. Exh. 2.

65. Part of Keith's alibi was that at approximately 9:00 p.m., he and Melanie Davison arrived in Crestline at the home of his aunt, Gracie Keith. Exh. 18; Tr. p. 685. Among the many people that were there that night was Yolanda Price. Price recalls Keith arriving at Gracie Keith's home between 8 p.m. and 9 p.m, and she recalls seeing Melanie in Zina Scott's blue car. Exh. 2. Yolanda Price left shortly after Kevin left, and she arrived home around 9:30 p.m., when she first heard about the murders in Bucyrus. *Id.*

66. The sheer distance involved makes it impossible for Kevin to have been the shooter. From Gracie Keith's house, in Crestline, it is 19 miles to the Bucyrus Estates apartment where the shootings occurred, and it would have taken approximately 25 minutes to make that drive. Exh. 3 (Google map of drive from Crestline to Bucyrus.)

67. Defense counsel should have known to interview Yolanda Price, because Gracie Keith identified Price as one of the people who was at her home the night that the murders occurred. Tr. p. 684. But no one from Keith's defense ever contacted Price. Exh. 2.

68. Furthermore, Price had personal knowledge of Rodney Melton's intentions to kill Rudel Chatman if he ever found out that Chatman had informed on him. Price heard Melton say, "If Rudel ever snitched on me, I'd kill him." Exh. 2. Rudel Chatman was, in fact, a police informant against Melton with regard to Melton's heroin sales. *See* Fourth Ground for Relief.

69. Price would have been a strong alibi witness for Keith, because unlike Grace Keith, she was not related to Keith in any way. Exh. 2. Testimony from Price would have bolstered Keith's defense. Keith was prejudiced by his counsel's failure to call her as a witness on his behalf.

**Fourth Ground for Relief**

**Kevin Keith was denied the effective assistance of counsel during the trial phase of his capital trial, when counsel failed to investigate and present evidence that Rudel Chatman was an informant against Rodney Melton regarding Melton's heroin sales.**

70. Kevin Keith's trial counsel failed to represent him according to the prevailing norms at the time of his capital trial.

71. Keith's trial was in 1994. At that time, the guides to determining what was reasonable legal representation in a capital case were the 1989 version of the American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases.

72. Guideline 11.4.1 governs the investigation aspect of defense counsel's representation in death penalty cases. Subsection D.7 of that Guideline advises that counsel should secure the assistance of experts where it is necessary or appropriate for the "preparation of the defense," "adequate understanding of the prosecution's case," or for "rebuttal of any portion of the prosecution's case at the guilt/innocence phase."

73. Ineffective assistance of counsel is measured under the standards established in *Strickland v. Washington*, 466 U.S. 668 (1984). First, the defendant must show that counsel's performance was deficient. "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.* at 688. To demonstrate prejudice, a defendant must "show that there is a reasonable probability that,

31

but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

74. Rudel Chatman was a police informant against Melton with regard to Melton's heroin sales. During Keith's clemency proceedings, the State confirmed what Keith's counsel suspected: "On April 11, 1994, two months *after* the murders, Melton was indicted for a drug trafficking offense, in which Rudel Chatman was a confidential informant." Exh. 8 (State's supplement to the parole board)(emphasis in original).

75. The State claimed that Melton, however, would not have had any reason to know that Chatman was an informant against him until Melton's arrest on March 25, 1994. *Id.* The State is wrong, however, as evidenced by the statements of Rodney Melton's accomplice, Milton James Parker.

76. The March 4, 1994, police interview with Milton James Parker confirms that the Meltons had figured out that Rudel Chatman was an informant. Exh. 9, p. 16. When the police asked Parker if he knew anything about the Bucyrus killings (for which Keith had already been arrested), Parker responded by telling them that "we know about Rudell [sic], you know? You might as well just keep him under wraps or whatever you're gonna do with him, Jerry[5], you know? 'Cause he's done around here." *Id.* This interview occurred three weeks *before* Melton was arrested, and less than three weeks after the Bucyrus Estates killings.

77. Keith's defense counsel should have known about Melton's arrest for drug trafficking, because it occurred before Keith's trial began. Keith's counsel specifically inquired into Melton's motive for committing the killings, and he questioned Melton on the witness

_____

[5] "Jerry" is Detective Jerry Hickman.

stand about his threats to Rudel Chatman at the hospital. Tr. p. 758-59. Had counsel interviewed Melton's accomplices after Melton's arrest, he would have learned that Melton knew that Rudel Chatman was an informant.

78. Milton James Parker would "hang out with Rodney Melton and Bruce Melton back in the early and mid-nineties," because he was a drug user and the Meltons sold drugs. Exh. 7. Parker recalls "that Rodney Melton told me that Rudel Chatman was a snitch." *Id.* Although Parker cannot now recall the exact date on which Melton told him that, he does recall that it was "before the day that Rudel's family got shot at the Bucyrus Estates." *Id.*

79. Had counsel investigated, he would have learned that Melton knew that Rudel Chatman was an informant against him. Melton admitted at Keith's trial that he told Chatman that "maybe something [Chatman] done made something like this happen." Tr. 758. Chatman's role in getting Melton arrested would have added a whole new context to this statement by Melton.

80. Presenting this information to the jury would have fit perfectly into the defense that defense counsel presented on Keith's behalf. Therefore, counsel did not make a tactical decision to forgo this line of investigation. Were that the case, such a decision would have been unreasonable. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691.

81. Keith was significantly prejudiced by counsel's failure to investigate and present evidence to the jury of Melton's motive to seek revenge against Chatman. "From

beginning to end the case is about who committed the crime. When identity is in question, motive is key." *House v. Bell*, 547 U.S. 518, 540 ( 2006).

## IV. Procedural Default

**Kevin Keith was denied the effective assistance of counsel during his state post-conviction proceedings, when his counsel failed to identify and present meritorious issues regarding the ineffective assistance of trial counsel.**

Kevin Keith was denied the effective assistance of counsel during the first phase of his collateral proceedings, when his counsel failed to identify and present meritorious issues regarding the ineffective assistance Keith received from trial counsel. Keith's state post-conviction counsel failed to represent him according to the prevailing norms at the time of his capital trial. Because Keith's issues were never presented to the state courts, they are procedurally defaulted. But the Supreme Court ruled in *Martinez* that "a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." 132 S. Ct. at 1320.

Unlike the petitioner in *Trevino v. Thaler,* Keith did not receive the benefit of new attorneys in federal habeas. *See Trevino*, 133 S. Ct. at 1915. Keith's post-conviction counsel continued on to represent him in his federal habeas proceedings, and it was not until 2007—after his habeas proceedings had concluded in this Court and the Sixth Circuit—when his case was reviewed by fresh eyes. Regardless, at the time Keith's habeas petition was considered and rejected by this Court, the precedent was clear that procedural default would bar consideration of any claims that had not been properly presented in state court. The ineffective assistance of post-conviction counsel, at that time, could not excuse the failure to raise the claim. *See Coleman v. Thompson*, 501 U.S. 722, 752-753 (1991). Thus, even if Keith had counsel who had realized

that post-conviction counsel missed several meritorious issues of ineffective assistance of trial counsel, they could not have presented them to this Court at that time.

Last year, however, the Supreme Court ruled that "a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." *Martinez,* 132 S. Ct. at 1320. The Court limited its holding. First, the underlying issue must have involved a claim that could not have been raised on direct appeal. *Id.* at 1317-18. Second, post-conviction counsel must have been ineffective under the standards enunciated in *Strickland v. Washington,* 466 U.S. 668 (1985). *Martinez,* 132 S. Ct. at 1318. Third, the underlying claim must be "a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Id.* (citation omitted).

In reaching its holding in *Martinez,* the Court acknowledged and modified its holding in *Coleman v. Thompson,* 501 U.S. 722, 754 (1991), explaining that "an attorney's errors during an appeal on direct review may provide cause to excuse a procedural default, for if the attorney appointed by the State to pursue the direct appeal is ineffective, the prisoner has been denied fair process and the opportunity to comply with the State's procedures and obtain an adjudication on the merits of his claims." *Martinez,* 132 S. Ct. at 1317. The fundamental concern underlying the Court's holding in *Martinez* is that "[w]hen an attorney errs in initial-review collateral proceedings, it is likely that no state court at any level will hear the prisoner's claim." *Id.* at 1316. Furthermore, "if counsel's errors in an initial-review collateral proceeding do not establish cause to excuse the procedural default in a federal habeas proceeding, no court will review the prisoner's claims." *Id.*

Until now, this is precisely the quandary in which Keith had found himself. Current counsel discovered several meritorious issues that were never raised by post-conviction counsel/first habeas counsel. But there was no court available to consider Keith's claims on the merits.

*Martinez* remedied this problem, until the Sixth Circuit determined in February that *Martinez* is inapplicable in Ohio:

> We respect *Martinez*'s emphasis that its conclusion was a narrow one and join our sister circuits in refusing to expand it. *See, e.g., Ibarra v. Thaler*, 687 F.3d 222, 224 (5th Cir. 2012); *Arnold v. Dormire*, 675 F.3d 1082, 1087 (8th Cir. 2012); *Banks v. Workman*, 692 F.3d 1133, 1148 (10th Cir. 2012). By its terms, *Martinez* does not address the type of situation that Moore presents here. Not only does Ohio permit ineffective assistance of trial counsel claims to be made on direct appeal, Moore raised this claim on direct appeal and the Ohio Supreme Court rejected it on the merits.

*Moore v. Mitchell*, 708 F.3d 760, 785 (6th Cir. 2013).

Then, two months ago, the Supreme Court clarified in *Trevino v. Thaler* that *Martinez* applies in states such as Ohio as well. "[W]here, as here, state procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal, our holding in *Martinez* applies." *Trevino,* 569 U.S. __, 133 S.Ct. at 1921. *Trevino* clarified that *Martinez* does apply in states like Ohio, and it "undercuts the reliance … on *Moore v. Mitchell*, 708 F.3d 760, 785 (6th Cir. 2013), on the narrowness of the *Martinez* holding and a parallel narrow reading in *Ibarra v. Thaler*, 687 F.3d 222, 224 (5th Cir. 2012), *Arnold v. Dormire*, 675 F.3d 1082, 1087 (8th Cir. 2012), and *Banks v. Workman*, 692 F.3d 1133, 1148 (10th Cir. 2012), cited by the Sixth Circuit." *Landrum v. Anderson*, 2013 U.S. Dist. LEXIS 84677 (S.D. Ohio June 17, 2013). Therefore, the timing is appropriate for Keith to file the above issues with this Court in the hopes of obtaining federal habeas relief.

Keith's post-conviction counsel failed to provide him with the effective assistance of counsel. They failed to investigate and raise issues that are crucial to proving Keith's innocence. Expert review of the impression evidence would have shown that the car linked to Keith could not have been the car that left the imprints in the snow. The use of some of Warren's hospital records would have cast serious doubt on his purportedly "independent" recollection of the shooting. Presenting the sworn testimony of Yolanda Price would have bolstered Keith's alibi defense, which was especially necessary because the State attacked the credibility of Grace Keith ,Keith's main alibi witness. And informing the jury about Rodney Melton's motive to seek revenge against Rudel Chatman (not to mention his statements that he would kill Rudel if he "snitched" on him) would have surely made a difference in the outcome of Keith's trial. All of these claims are "substantial one[s]," and have—at the very least—"some merit." *Martinez,* 132 S. Ct. at 1318.

None of these claims could have been raised on direct review, because all of them require evidence that is outside the record. *See* Exhs. 2, 7, 16, 17. This evidence is necessary to prove prejudice. *See State v. Keith*, 684 N.E.2d 47, 67 (Ohio 1997) (addressing Keith's IAC mitigation claims: "[W]e find that appellant has failed to prove prejudice. To do so would require that there was mitigating evidence counsel failed to present and that there is a reasonable probability that the evidence would have swayed the jury to impose a life sentence. Establishing that would require proof outside the record, such as affidavits demonstrating a lack of effort to contact witnesses or the availability of additional mitigating evidence. Such a claim is not appropriately considered on a direct appeal.")

Keith's post-conviction counsel should have known to investigate, raise, and support with evidence the claims filed in this petition. They recognized that trial counsel "failed to properly

investigate the case or request sufficient time to properly investigate the case prior to trial," as they argued in Keith's direct appeal brief. Exh. 19, p. 121. But they failed to then conduct the work themselves and identify issues like the ones contained herein. *See State v. Cole*, 443 N.E.2d 169, 171 (Ohio 1982) ("Where ineffective assistance of counsel is alleged in a petition for postconviction relief, the defendant, in order to secure a hearing on his petition, must proffer evidence which, if believed, would establish not only that his trial counsel had substantially violated at least one of a defense attorney's essential duties to his client but also that said violation was prejudicial to the defendant.")

This Court recognized in 2009, while addressing separate issues, that Keith's previous habeas counsel were less than thorough in their investigative efforts on Keith's behalf. "The Ohio Public Defender was thorough in its investigative efforts on Keith's behalf. It is unclear, however, why Keith's prior counsel could not have obtained this information in time to include it in his 1999 federal habeas petition. Keith does not indicate that any of this information could not have been acquired through the same channels that the Ohio Public Defender obtained it in 2007." Case No. 1:08-cv-01687-PCE, Document 14, p. 8. At that time, this Court only knew the tip of the iceberg, because Keith was unable to argue (nonfrivolously) that the Court could consider on the merits the issues contained in this petition. *See Coleman*, 501 U.S. at 752-753.

Keith's post-conviction counsel failed to raise meritorious issues, and as a result, no court has ever ruled on the meritorious issues contained herein. But for post-conviction counsel's failures, the result of Keith's proceedings would have been different. For the first time, this Court can consider these issues on the merits.

**V.      These claims are exhausted because there is an absence of an available State corrective process**.

Because there is no state forum in which Keith can litigate the claims contained herein, the claims are exhausted. There is "an absence of available State corrective process" through which Keith can litigate his claims in state court. 28 USCS § 2254 (b)(1)(B)(i). As a result, there is no state court adjudication on the merits of these claims, and 28 U.S.C. § 2254(d) is therefore inapplicable. *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1399-1400 (2011).

Keith cannot litigate his claims in state court by filing a successor state post-conviction petition under Ohio Rev. Code § 2953.23. As the Sixth Circuit has recognized, "Ohio law permits second, successive, or untimely petitions only under limited circumstances. Ohio Rev. Code § 2953.23. Successive post-conviction relief petitions are barred unless the petitioner was unavoidably prevented from discovering the facts on which he later seeks to rely in a successive petition, or the United States Supreme Court has recognized a new right that applies retroactively to the petitioner. In addition, the prisoner must show that, but for the error, no reasonable fact-finder would have found him guilty, or, in a death penalty case, eligible for the death sentence. Ohio Rev. Code § 2953.23(A)(1)." *Moore v. Mitchell*, 708 F.3d 760, 776 (6th Cir. 2013).

Although Keith is innocent and could make the showing that no reasonable factfinder would find him guilty, he cannot show that he was "unavoidably prevented from discovering" the information upon which these claims are based. Ohio Rev. Code § 2953.23(A)(1). In fact, his post-conviction counsel were ineffective for their failure to discover it. And the other potential avenue for filing a successor state post-conviction petition—that the Supreme Court has recognized a new right—is equally inapplicable. *Martinez* did not create a new right. *See Martinez*, 132 S. Ct. at 1315 (stating that although there may be a justification for an exception to the "no right to counsel in collateral proceedings" rule, this is not the case to resolve whether that exception exists).

Nor can Keith rely on Ohio Criminal Rule 33 to file his claims in state court. To file a new trial motion under Rule 33, Keith would have had to file the motion "within one hundred twenty days after the day upon which the verdict was rendered," or he must demonstrate that he was "unavoidably prevented from the discovery of the evidence upon which he must rely." Ohio Crim. R 33(B). The failures of post-conviction counsel do not, so far, equate to being unavoidably prevented from the discovery of the evidence.

## VI. Keith's habeas petition is not "successive."

Kevin Keith could not have raised the habeas claims set forth in this petition in his initial habeas petition. Keith's claims were not identified and raised by his state post-conviction counsel. Therefore, they were not raised in his initial habeas petition. Before *Martinez*, a habeas petitioner could not raise a claim that was not raised in his state post-conviction proceedings and have it considered on the merits.

"Although Congress did not define the phrase 'second or successive,' as used to modify 'habeas corpus application under section 2254,' §§ 2244(b)(1)-(2), it is well settled that the phrase does not simply refe[r] to all § 2254 applications filed second or successively in time." *Magwood v. Patterson*, __ U.S. __, 130 S. Ct. 2788, 2796 (2010) (internal citations omitted). Keith has already fully litigated one federal habeas petition under § 2254, but that does not make this petition successive and subject to the standard under 28 U.S.C. § 2244(b)(1). The Supreme Court has rejected the argument that a habeas petition filed second in time must automatically be treated as successive. *Panetti v. Quarterman,* 551 U.S. 930, 944 (2007) (citing *Stewart v. Martinez-Villareal,* 523 U.S. 637, 643 (1998) ("The State argued that because the prisoner 'already had one fully-litigated habeas petition, the plain meaning of § 2244(b) … requires his new petition to be treated as successive.' We rejected this contention.") The statutory phrase

"second or successive" is a term of art in the habeas context, not a mere mathematical computation.

The Sixth Circuit has, accordingly, recognized that a subsequent petition is not necessarily "second or successive" under AEDPA. For example, in *In re Salem*, 631 F.3d 809, 813 (6th Cir. 2011), the Court found that Salem's subsequent habeas application was not "successive" and should be treated as a continuation of her initial habeas application. *Salem*, 631 F.3d at 813. *See also In re Bowen*, 436 F.3d 699, 704 (6th Cir. 2006).

To determine whether to subject Keith's petition to the "successor" standard, this Court should apply the "abuse of the writ" test. "Although § 2244(b) specifies the treatment of second or successive petitions, courts defining 'second or successive' generally apply abuse of the writ decisions, including those decisions that predated AEDPA." *Bowen*, 436 F.3d at 704 (citing *Martinez-Villareal*, 523 U.S. at 643-45. "In *Sanders v. United States*, 373 U.S. 1 (1948), the Supreme Court explained abuse of the writ: If a prisoner deliberately withholds one of two grounds for federal collateral relief at the time of filing his first application, in the hope of being granted two hearings rather than one or for some other such reason, he may be deemed to have waived his right to a hearing on a second application presenting the withheld ground. … Nothing in the traditions of habeas corpus requires the federal courts to tolerate needless, piecemeal litigation, or to entertain collateral proceedings whose only purpose is to vex, harass, or delay." *Bowen*, 436 F.3d at 704.

The purpose of this instant petition is certainly not to "vex, harass, or delay." In fact, Keith is no longer under a sentence of death, so a delay for him serves no purpose. Furthermore, the issues contained in this petition are substantive, meritorious issues.

"The government has the burden of pleading abuse of the writ, and that once the government makes a proper submission, the petitioner must show that he has not abused the writ in seeking habeas relief." *McCleskey v. Zant*, 499 U.S. 467, 477 (1991). "Under the abuse-of-the-writ doctrine, a subsequent petition is 'second or successive' when it raises a claim that was, or could have been, raised in an earlier petition." *James v. Walsh*, 308 F.3d 162, 167 (2d Cir. 2002). The abuse-of-the-writ standard has been used by the majority of the circuits in determining whether to label a petition successive. *See id.*; *Benchoff v. Colleran*, 404 F.3d 812, 817 (3d Cir. 2005) ("[W]e find that the abuse of the writ doctrine retains viability as a means of determining when a petition should be deemed 'second or successive' under the statute."); *Crouch v. Norris*, 251 F.3d 720, 723 (8th Cir. 2001) ("That Crouch's proposed petition is subject to § 2244(b) 's limitations is, however, not dispositive. Although Crouch's proposed petition neither relies on a new rule of constitutional law nor identifies newly-discovered facts that establish his innocence of the underlying sex offenses, Crouch may nevertheless be free to file his proposed petition in the district court if it is not 'second or successive'"); *Hill v. Alaska*, 297 F.3d 895, 898 (9th Cir. 2002) ("That a prisoner has previously filed a federal habeas petition does not necessarily render a subsequent petition 'second or successive'").

Keith has suffered the ineffective assistance of trial counsel, and then the ineffective assistance of state post-conviction counsel. Had he been afforded the representation he was entitled to during those proceedings, he would not now need to file them with this Court. He has not abused the writ.

### VII.    Conclusion

Kevin Keith has been imprisoned for nearly 20 years for a crime he did not commit. Due to procedural limitations and ineffective counsel, this Court never had the opportunity to review

some of Keith's most compelling claims.    Recent decisions from the Supreme Court of the United States—*Martinez v. Ryan* and *Trevino v. Thaler*— have removed those procedural barriers.  Keith can now present this Court with the ineffective assistance of counsel issues that should have been a part of Keith's original federal habeas petition.

Keith is entitled to the writ of habeas corpus, and to a new trial.

Respectfully Submitted,

The Office of the Ohio Public Defender

/s/ Rachel Troutman
Rachel Troutman – 0076741
Assistant State Public Defender
Rachel.Troutman@OPD.ohio.gov
**Lead Counsel**

/s/ Tyson L. Fleming
Tyson L. Fleming  – 0073135
Assistant State Public Defender
Tyson.Fleming@OPD.ohio.gov

Office of the Ohio Public Defender
250 E. Broad Street - Suite 1400
Columbus, Ohio 43215
(614) 466-5394
(614) 644-0708 – Fax

Counsel for Petitioner

**CERTIFICATE OF SERVICE**

This is to certify that a copy of the foregoing was electronically filed this 26th day of July, 2013.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Respectfully submitted,

/s/Rachel Troutman
Rachel Troutman (0076741)

Counsel for Petitioner